WEMBELTON DEVELOPMENT COMPANY v THE TRAVELERS
INSURANCE COMPANY

1. Contracts—Interpretation—Impossible Conditions.

Courts will not interpret a contract in a manner which would impose an absurd or impossible condition on one of the parties.

2. Contracts—Interpretation—Appeal and Error—Insufficient Record.

The Court of Appeals will vacate the judgment of a lower court interpreting the conditions of a contract and remand for further proceedings where questions as to the conditions of the contract are not susceptible to answer because of an inadequate trial record.

Appeal from Oakland, Robert L. Templin, J. Submitted Division 2 December 13, 1972, at Detroit. (Docket No. 13301.) Decided February 22, 1973.

Complaint by Wembelton Development Company against The Travelers Insurance Company for breach of contract. Judgment for plaintiff. Defendant appeals. Reversed and remanded for a new trial.

*Grant, Schon, Wise & Grant,* for plaintiff.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *W. A. Steiner, Jr.),* for defendant.

Before: Quinn, P. J., and V. J. Brennan and O'Hara,* JJ.

References for Points in Headnotes
[1] 17 Am Jur 2d, Contracts §§ 10, 404–406.
[2] 5 Am Jur 2d, Appeal and Error § 977.

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

O'HARA, J. Defendant Travelers Insurance Company (hereinafter "Travelers") appeals as of right from the decision of the trial judge sitting as trier of fact holding plaintiff Wembelton Development Company (hereinafter "Wembelton") entitled to judgment in the amount of $6,000.

The pertinent facts in this case appear as follows: Plaintiff land developer on March 25, 1965, borrowed the sum of $260,000 (a land-development loan)[1] from defendant insurance company and contemporaneously executed a note, a mortgage on 40 lots to secure the loan, and a document entitled "Supplemental Agreement".[2] Pursuant to the terms of the mortgage and the supplemental agreement, Wembelton could seek mortgage releases for each of the 40 lots individually by payment of $7,200 with accrued interest, plus an additional *$150 for each lot.* The latter sum was to be held by Travelers and administered as an escrow fund pursuant to terms of the supplemental agreement. That agreement provided in paragraph 3 that if Travelers received so-called "end loans" (permanent residential mortgages arising out of the contemplated subdivision) on at least 1/2 (20) of the 40 lots covered by the mortgage, the escrow fund would be returned to Wembelton.[3] Wembelton was obligated to use its "best efforts" to obtain

---

[1] Wembelton was in the business of buying land and then developing that land into parcels which could be sold as individual lots to builders.

[2] Several months earlier Travelers had issued an initial commitment to make the loan dependent upon completion of certain improvements on the undeveloped land.

[3] The relevant part of paragraph 3 states:

"In the event that the Company shall obtain end loans on at least fifty per cent (50%) of the lots covered by said mortgage, Wembelton will have no further obligation under this paragraph, and all escrow funds shall be returned to it.

"If the Company receives end loans on less than fifty per cent (50%)

end loans for defendant on the individual lots covered by this mortgage. Travelers, in turn, promised to process end-loan applications in accordance with its usual procedures and to accept or reject such applications pursuant to its then existing standards on similar loans in the Detroit metropolitan area.[4]

With the approach of the April 1, 1968 maturity date on the loan, Wembelton requested information about paying off the loan and discharging the mortgage. Travelers sent a payoff letter which *inter alia* stated a balance of $2,550 was due under terms of the supplementary agreement.[5] This sum was paid without protest along with certain other moneys not relevant to the instant case.

The first indication of disagreement over who was entitled to the escrow fund was when Wembelton, on January 5, 1970, wrote Travelers requesting the return of what it claimed was Wembelton's $6,000. This request was refused and Wembelton brought suit claiming that Travelers breached the supplementary agreement by refusing to process end-loan applications during most of the period when the agreement was operative.

In particular, plaintiff alleged that between August of 1966 and April of 1968 (the latter being the

of the lots covered by said mortgage, then Wembelton shall pay the Company Six Thousand and 00/100 Dollars ($6,000.00)."

[4] Paragraph 4 states:

"The Company will process all end loan applications on said lots in accordance with its normal and customary procedures and will accept or reject said applications pursuant to its then existing policy for loans of similar character on like property in the metropolitan Detroit area. It is understood, however, that the percentage of end loans obtained by the Company, as specified in paragraph 3 above, refers to loans actually closed by the Company."

[5] Had the mortgage on all 40 lots been released at the prevailing rate of $150 per lot then there would have been $6000 in the escrow fund. However, since Travelers had only executed releases as to 23 lots there was merely $3,450 in the escrow account (which left the sum of $2,550 owing Travelers).

payoff date of the mortgage) Travelers did not follow its normal and customary procedures in processing end loans in the Detroit metropolitan area. During this period, plaintiff asserts no home mortgages were placed by anyone with defendant since Travelers had withdrawn from the financing of single-home mortgages and was not even accepting mortgage applications.[6]

The allegations were denied by defendant Travelers, which sought to establish, among other things, that it had processed applications in accordance with its then existing policy for similar loans on like property in the Detroit metropolitan area and that, in any event, end loans could not have been placed on the requisite 50% of the homes for the reason that such loans as were made by other lenders on the involved lots were not on terms which Travelers would have deemed acceptable[7] or were made after the mortgage was paid off. Evidence with respect to the latter matters was rejected by the trial judge.

This is the background against which the trial judge held that paragraph 4 of the supplemental agreement relating to Travelers processing end-loan applications in accordance with its usual procedures and accepting or rejecting applications pursuant to its then policy did not authorize defendant to completely forgo the making of end loans.[8] He further found that Travelers' with-

---

[6] Defendant admits more than 50% (23) of the lots covered by the mortgage were released between August, 1966 and April, 1968.

[7] Travelers had a maximum dollar amount which it would lend on any piece of property ($40,000). The lender, similarly, had a maximum number of years which it would permit a loan to remain outstanding (25–30 years). Nor would Travelers make a loan exceeding a certain per cent of the value of the property (75–80%).

[8] The record contains testimony indicating it was changes in the Michigan usury law which led Travelers to reassess its policy re the financing of end loans on private homes.

drawal from the home-loan market had rendered it impossible for plaintiff to fulfill its contractual obligation to try and place end loans on at least 50% of the lots covered by the mortgage herein. Hence he held plaintiff was entitled to the $6,000.

The nub of this case involves construction of the amorphous language contained in paragraphs 3 and 4 of the supplemental agreement. Precisely what Wembelton's obligation was under the contract and whether it could have performed in fact sans the obstacles raised by defendant's new mortgage policy are questions not susceptible to answer because of the inadequate trial record.

We agree with the finding of the trial judge that defendant's obligation to process end-loan applications could not be construed to mean that Travelers could refuse to process mortgage applications, withdraw from the end-loan market and declare that to be its then policy for loans in the Detroit metropolitan area as a means of preventing the condition arising which obligated it to turn over the escrow fund to Wembelton (placement of 50% of the end loans with Travelers). Courts will not interpret a contract in a manner which would impose an absurd or impossible condition on one of the parties.

Nor do we quarrel with his amply documented finding that Travelers was out of the end-loan business between late 1966 and all of the ensuing year. We further note defendant apparently admits its self-imposed moratorium on such transactions continued through the payoff date of the mortgage.

The point of our most vigorous disagreement with the trial judge relates to his finding that Wembelton was prevented from performing by the subsequently adopted policy of defendant. Mayhap,

this is true. However, the state of the record permits us to answer neither yea nor nay on this crucial issue.

The record does disclose Wembelton sold 34 out of the 40 lots on land contract to R. & A. Land Planners, Inc. (R. & A.), a builder, whose president was one Roy Mercer. The sale took place on March 15, 1965, and the land contract recites that the purchase money and interest must be fully repaid within four years. The document imposed an obligation on R. & A. similar to that imposed on Wembelton by the supplementary agreement, *i.e.,* that it use its best efforts to influence its customers to apply to Travelers for mortgages. The record is conspicuously silent as to when R. & A. made final payment on the lots and when Wembelton obtained release of the lots from the mortgage by payment of the prescribed fee into the escrow fund.

One Leroy Helfman, a corporate officer of Wembelton, related how Mercer, president of R. & A., had his mortgage money and he allegedly was turned down because Travelers said it no longer was in the home-mortgage business in the Detroit area. However, Helfman supplied no dates as to when this conversation occurred and, more importantly, the number of mortgages sought by R. & A.

The same corporate official testified the remaining lots on which Travelers held the mortgage were sold to individuals who signed land contracts obligating them to seek end loans from Travelers (he characterized it as a right of first refusal). We are unable to verify these statements since the land contract and other documents relating to these particular sales are not part of the trial record.

With regard to the extent and effectiveness of

Wembelton's efforts on behalf of Travelers, Helfman stated he directed some of the individual purchasers to Travelers for end loans although he did not personally know if any of these persons actually secured financing through the defendant. He added that Herman Kaplan, another corporate officer of plaintiff, obtained a construction loan from Travelers but did not know if Travelers got the end loan on the lot. He was aware most of the first people to purchase lots didn't build until much later, *i.e.,* 1967, 1968, and 1969.

Per contra, Travelers cites the fact that its records show only two applications for end loans submitted on lots covered by the mortgage executed between plaintiff and Travelers, one by Kaplan, on April 22, 1966, and one by Mercer, on June 24, 1966. Both applications were approved and committed Travelers to grant an end loan in the amount of $40,000 at 6% interest. Travelers didn't receive either loan.

Basically, more than a small measure of the difficulty encountered by this Court in this case, and we suspect possibly by the trial judge, lies in the equivocal and indefinite nature of the language in which the obligations of both parties are expressed.

Wembleton is required to

"use its best efforts to obtain for the company the end loans on the individual lots covered by said mortgage."

Courts are hard put to determine what degree of effort constitutes a party's "best efforts". No less difficult is it to determine how another party can finally obtain "end loans" on 20 lots if a condition is included in the granting of the loans which limits the requirement of acceptance of mortgage

loans to the company's "then existing policy". We see nothing to do but vacate the judgment as entered and remand for further proceedings.

On retrial plaintiff will again be afforded the opportunity to prove it could have performed and defendant will be permitted to introduce the proofs erroneously excluded by the learned trial judge, which it claims will prove Wembelton could not have secured sufficient end loans for Travelers to waive the release fees.

Reversed, with costs to the defendant.

All concurred.