1997-NMCA-104

946 P.2d 1122

**Richard PADILLA, Plaintiff–Appellant,**

v.

**RRA, INC., and Stan Rashkin, individually and as Vice President of RRA, Inc., Defendants–Appellees.**

**No. 17572.**

Court of Appeals of New Mexico.

Sept. 8, 1997.

**113**

that provided by his written contract with RRA.

(3) The district court entered a partial summary judgment rejecting the oral-contract claim on the ground that the terms of the alleged commission arrangement were too uncertain. At a non-jury trial on the written-contract claim, the court dismissed the claim at the close of Padilla's evidence. Padilla appeals both adverse decisions by the district court. We reverse the partial summary judgment and remand for further proceedings on the oral-contract claim. We affirm the judgment in favor of RRA and Rashkin (Defendants) on the written-contract claim.

Arnold Padilla, Corrales, for Plaintiff–Appellant.

Lorna M. Wiggins, Taichert & Wiggins, P.C., Albuquerque, for Defendants–Appellees.

## OPINION

HARTZ, Chief Judge.

(1) RRA is a temporary personnel agency that supplies technical employees to national laboratories and other contractors. The agency pays the employee's wages and benefits, and the contractor pays the agency for supplying the employee. In early 1993 Richard Padilla was employed by Kirk–Mayer, Inc., another temporary personnel agency, which provided his services to Sandia National Laboratories (Sandia) as an engineering associate. RRA decided to compete for the contract to supply that position to Sandia and advertised in a local paper for people qualified to fill it. Padilla responded to the ad, was hired by RRA, and continued to work at Sandia as an engineering associate.

(2) Two disputes arose regarding Padilla's compensation by RRA. First, he claimed breach of an oral contract negotiated with Stan Rashkin, a vice president of RRA, to pay him a commission of one to ten percent if he procured additional contracts for RRA. He alleged that he obtained two contracts with a total value of $655,200 but was paid only a $750 finder's fee. Second, he contended that he was paid an hourly wage below

## I. The Oral Contract

(4) We first consider the propriety of the partial summary judgment in favor of Defendants with respect to the alleged oral contract. On appeal of a grant of a motion for summary judgment, we review the evidence in the light most favorable to the opposing party. *See Gardner–Zemke Co. v. State,* 109 N.M. 729, 732, 790 P.2d 1010, 1013 (1990). Accordingly, we ignore Rashkin's sworn denials that he reached any agreement with Padilla regarding referral fees. We assume the truth of Padilla's sworn statements and assess whether that testimony suffices to establish an enforceable contract between Padilla and RRA. *See id.*

(5) Defendants contend that there is no contract because the alleged terms are too indefinite. *See Las Cruces Urban Renewal Agency v. El Paso Elec. Co.,* 86 N.M. 305, 308–09, 523 P.2d 549, 552–53 (1974); Restatement (Second) of Contracts § 33 (1981) (the Restatement). Their argument focuses on the absence of a specific commission rate.[1] Padilla's deposition testimony regarding the compensation terms was as follows:

> A: And [Rashkin] asked me what I thought on it, and I said, "Well, to me, I

1. Defendants also mention in passing that the purported agreement did not establish the time or place of performance or penalty provisions. But those omissions are not fatal. The absence of a penalty provision means only that no penalty can be enforced. As for the time and place of performance, when such terms have not been negotiated, courts generally impose a reasonableness standard, *see* Restatement § 33 cmt. d, and Defendants suggest no reason why such a standard would be inappropriate here.

would like to get somewhere between one and ten percent, depending on the size of the contract and how much of a profit margin there was for the company."

Because he says, "Oh, yeah, ten percent is pretty high, but it would all have to depend on what—you know, each contract is different."

Like I said, depends on the billing rate and how much of a profit that Sandia allows. Some contracts end up with a lot higher profit rate than other ones do. And I told Stan I understand that if the company don't make much, then I don't make much; but if the company makes a bunch, then I expect to get a lot of it, also. And he agreed to it and—

**Q:** He agreed to what?

**A:** To the fact of giving one to ten percent. And I told him, okay, because I know of a couple of contracts that are coming up, and I think I can get the people to come over to Ray Rashkin & Associates.

And he said it sounded very good to him, because they were just breaking into Sandia at the time, and he could use all the new contracts there that they could muster. Up to that point, they were basically out in Los Alamos.

And [Rashkin] told me then that if I brought in a contract that he would get with me afterwards, show me all the paperwork on it, as far as how much it was, getting—actually bringing in, where everything was going to, and then we would negotiate the one to ten percent depending on, you know, how it came out. And I said, "Fine, that way we can look over the figures and I'd know exactly why you're offering," like I told him, "two, one, eight, ten, whatever."

To paraphrase, Padilla and Rashkin agreed that if Padilla procured a contract, the two would then review the circumstances surrounding the contract and negotiate a commission of between one and ten percent.

■ (6) Indefiniteness can defeat a contract claim in two ways. First, indefiniteness can indicate that the parties failed to reach an agreement. Restatement § 33(3) states: "The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." Illustration 7 of comment e to Section 33 provides an example: "A promises to sell and B to buy goods 'at cost plus a nice profit.' The quoted words strongly indicate that the parties have not yet concluded a bargain."

(7) The partial summary judgment cannot be sustained on this ground. Whether a bargain was concluded between Padilla and RRA is a matter of fact, not law. Indefiniteness may "strongly indicate" the absence of a bargain, but in the circumstances presented here the indefiniteness does not conclusively establish the absence. It is significant that the alleged agreement provided that the commission rate was to be determined *after* Padilla procured a contract. A reasonable fact finder could infer from Padilla's testimony that the two parties intended to make a binding agreement because, as Rashkin probably knew, an employee in Padilla's position would probably not make the effort to procure additional contracts for RRA on the mere possibility of being compensated.

(8) That brings us to the second way in which indefiniteness can defeat a contract. Enforceability of a contract requires more than just the parties' intent to be bound. Restatement § 33(1) states: "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." The test of "reasonable certainty" is set forth in Restatement § 33(2): "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."

(9) The issue of indefinite price is addressed by comment e to Section 33. The comment notes that under the Uniform Commercial Code, the price of goods is set as "a reasonable price at the time for delivery if . . . the price is left to be agreed by the parties and they fail to agree." NMSA 1978, § 55–2–305(1)(b) (Repl.Pamp.1993). The comment then states, "Similar principles ap-

ply to contracts for the rendition of service." Restatement § 33 cmt. e, at 95.

■ (10) Thus, when two parties have bargained for one of them to provide personal services to the other but they have left the payment term to later negotiations, a court in appropriate circumstances may determine that the parties have reached an enforceable contract to provide the services for a "reasonable" payment. *Cf. Von Reitzenstein v. Tomlinson,* 249 N.Y. 60, 162 N.E. 584 (1928) (when payment term is too indefinite to be enforced, person providing services can recover in quantum meruit). The rationale for such a result is provided by Professor Farnsworth, who had served as Reporter for the Restatement.

> Surely it should be up to the parties at the time of the initial "agreement to agree" to indicate whether, if they fail to agree, there is no contract at all or a contract with the missing terms supplied by law. It should be within their power to adopt either premise by their agreement. The difficulty is that they often do not do this, so that the court is left to divine their expectations in this regard. The fact that one of the parties is to rely substantially on the agreement to agree argues therefore for enforceability, even in the absence of agreement, since it is not lightly supposed that one party has undertaken such reliance on the mere hope that agreement with the other party can be reached.

1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.7, at 177 (1990) (footnotes omitted).

(11) The problem here, however, is that Padilla has not argued for a "reasonable" fee, nor has he suggested any method of computing such a fee in this case. The record before us does not permit us to hold that a trial court could determine with reasonable certainty what a reasonable commission for Padilla would be.

■ (12) Nevertheless, Padilla presents an alternative ground for finding an enforceable contract. He points out that the commission rate to be negotiated was not totally uncertain. The rate was to be between one and ten percent. He contends that at least he should recover at the lowest rate. We agree that the evidence would support enforcement of a one percent commission. Restatement § 34 cmt. a states:

> [O]n such matters as subject matter and price, one party is often given a wide choice. If the parties intend to make a contract and there is a reasonably certain basis for granting an appropriate remedy, such alternative terms do not invalidate the contract. See § 33. Often a basis for remedy can be found in the rule of Comment b to § 362, permitting a remedy in accordance with the alternative chosen or in accordance with the alternative that will result in the smallest recovery.

(13) Professor Farnsworth discusses this principle in the context of a purported contract that leaves certain terms for later negotiation:

> In some situations it is within the power of one party to make the agreement enforceable even without the other party's agreement. If the term subject to agreement is also one that is subject to complete concession by the party that wants to have the agreement performed, that party's concession has been held to cure the indefiniteness. For example, all that was left to agreement in an option to buy land were the terms on which the stated price was payable. The option was held to be enforceable where the purchaser "tendered himself as ready, willing, and able to pay the agreed price therefor, either in cash or upon such terms as [the vendor] might impose," and later actually tendered cash.

Farnsworth, *supra,* § 3.29, at 368–69 (quoting *Morris v. Ballard,* 16 F.2d 175, 175 (D.C.Cir.1926)).

(14) We have found one reported decision closely in point. In *Browne v. Maxfield,* 663 F.Supp. 1193 (E.D.Pa.1987), the purported contract was for a salary between $75,000 and $125,000 with certain fringe benefits. *Id.* at 1198. Judge Pollak, in denying the prospective employer's motion for summary judgment, held that "the terms of the alleged contract are sufficiently specific to meet [the standard of Restatement § 33]." *Id.* He wrote,

> This evidence is adequate to allow a jury to determine that the contract would have

been breached by payment below $75,000 or by failure to provide [the plaintiff] with those benefits. The fact that the exact salary amount ... and other fringe benefits were not pinned down is not sufficient to defeat a finding that a contract was made absent any evidence that the missing terms were material to the parties.

*Id.*

(15) Likewise, we hold that Padilla's testimony, if believed, could sustain a verdict that Defendants breached an enforceable contract to pay Padilla a one percent commission.[2] We therefore reverse the partial summary judgment and remand for further proceedings on the oral-contract claim.

## II. The Written Contract

(16) Padilla's written-contract claim was tried to the court without a jury. At the close of Padilla's case in chief, Defendants moved for dismissal pursuant to Rule 1–041(B) NMRA 1997. The court granted the motion.

(17) Before addressing the merits of the court's ruling, we discuss the standard of review. A Rule 1–041(B) motion in a non-jury trial must be distinguished from a motion for directed verdict pursuant to Rule 1–050(A) NMRA 1997. A motion for a directed verdict should be granted only when all reasonable minds would agree that the plaintiff had failed to prove facts necessary to support a favorable judgment. *See In re Estate of Kimble,* 117 N.M. 258, 260, 871 P.2d 22, 24 (Ct.App.1994). In ruling on a Rule 1–041(B) motion, on the other hand, the trial judge acts as a fact finder who "weighs the evidence and passes judgment on whether the plaintiff has proved the necessary facts to warrant the relief asked." *Camino Real Mobile Home Park Partnership v. Wolfe,* 119 N.M. 436, 441, 891 P.2d 1190, 1195 (1995). Accordingly, we will sustain the grant of a Rule 1–041(B) motion even if the plaintiff has produced enough evidence to withstand a directed verdict under Rule 1–050(A), so long as the decision of the trial judge is rationally based on the evidence. *See Panhandle Pipe*

*& Steel v. Jesko,* 80 N.M. 457, 459–60, 457 P.2d 705, 707–08 (1969); *cf. Gomez v. Bernalillo County Clerk's Office,* 118 N.M. 449, 452, 882 P.2d 40, 43 (Ct.App.1994) (finding against party bearing burden of persuasion will be affirmed if "fact finder acted rationally"). Because Rule 1–041(B) leaves the fact finding to the trial judge, "we must view the evidence in the light most favorable to support the findings and judgments of the trial [judge]." *Panhandle Pipe & Steel,* 80 N.M. at 460, 457 P.2d at 708.

(18) The district court made the following findings of fact:

2. Prior to his employment by RRA, Richard Padilla had been employed as [a Sandia] Engineering Associate through Kirk–Mayer, Inc. another temporary personnel company. In the Spring of 1993, [Sandia] announced it would accept proposals in response to its Request for Quotations ("RFQ") for the Engineering Associate position that Richard Padilla held.

3. On March 8, 1993, [Padilla] met with the Manager of RRA, Inc.'s Albuquerque office, Rose Ann Casale. [Padilla] informed Ms. Casale that he currently held the Engineering Associate position and was interested in having RRA submit his resume in its response to the RFQ.

4. During [Padilla's] March 8, 1993 meeting with Ms. Casale, [Padilla] informed Ms. Casale that he desired an hourly wage of $24 per hour and that he was currently being paid approximately $19 per hour for the position.

5. [Padilla] told Ms. Casale that [Sandia] would approve a standard billing rate of $35, but no more than $35, for the Engineering Associate position. A standard billing rate is the maximum amount [Sandia] will pay the contractor for the direct labor hourly rate that is actually paid to the contract employee plus RRA's overhead and profit. Based upon a $35 per hour standard billing rate, RRA agreed to submit a direct labor rate of $24 per hour for [Padilla]. Ms. Casale prepared and hand-delivered to [Padilla] a letter, dated March 8, 1993, that outlined

**2.** Although Rashkin argued below that he bears no individual liability because he acted only in his capacity as an officer and employee of RRA, he has not pursued that argument on appeal.

the employment benefits and the $24 hourly wage that [Padilla] requested. . . .

6. Following their meeting, [Padilla] submitted a document dated March 8, 1993 entitled "Employment Agreement" that Ms. Casale signed and returned to [Padilla]. . . .

7. [Padilla].knew at the time RRA submitted its response to the RFQ that [Sandia] would evaluate the response based upon cost (the standard billing rate and the hourly rate) and based upon the applicant's technical expertise and [Sandia] would evaluate the cost and applicant's technical skills of all responses to the RFQ.

8. As the parties agreed in their March 8 meeting, RRA submitted its response to the [Sandia] RFQ with a proposed direct labor rate of $24 per hour and a standard billing rate of $35 per hour. . . .

9. On or about May 11, 1993, [Padilla] signed a form of RRA employment contract with the report date, pay rate and overtime rates left blank. These sections were left blank because at the time neither RRA nor [Padilla] was aware of the hourly rate that [Padilla] would be paid if he accepted employment at [Sandia] through RRA. . . .

10. On May 27, 1993, Ms. Casale learned that [Sandia] had approved a direct labor rate of only $21 per hour for [Padilla] and had approved a standard billing rate of only $33.40 per hour, rather than the $35 which [Padilla] had assured RRA [that Sandia] would approve as the standard billing rate. Ms. Casale then calculated the maximum amount that RRA was prepared to offer [Padilla] as an hourly rate. The maximum amount, based upon an analysis of RRA's overhead and labor costs, was $23 per hour. As a result, RRA agreed to pay [Padilla] an additional $2 per hour. Ms. Casale telephoned [Padilla] on May 28, 1993 and told him that [Sandia] had approved a standard billing rate of only $33.40 per hour and a direct labor rate of only $21 per hour but that RRA was nevertheless prepared to pay him $23 per hour. [Padilla] said he did not like the idea but if that was the way it was

going to be, that was the way it had to be. From their conversation, Ms. Casale reasonabl[y] understood that [Padilla] had accepted the $23 hourly rate.

11. [Padilla] became a contract employee of RRA on Tuesday, June 15, 1993. He received his first paycheck from RRA on the following Friday, June 25, [1]993 which reflected a $23 hourly wage. [Padilla] never disputed his hourly rate in writing. [Padilla] never verbally complained to anyone at RRA about his hourly wage until his lawyer sent a demand letter to RRA, in December of 1993, alleging [Padilla] was owed a commission of somewhere between 1% to 5% of the value of new employment contracts he referred to RRA.

■ (19) Padilla does not challenge the sufficiency of the evidence to support any of the findings. Rather, he contends that virtually all the findings are irrelevant. He relies on the language of the employment agreement signed on March 8, 1993 by him and Rose Ann Casale, an RRA manager, claiming that the agreement unambiguously compelled RRA to pay him $24 per hour, a dollar per hour more than he was paid. He correctly points out that although the parol evidence rule does not bar consideration of evidence external to the contractual document for the purpose of resolving an ambiguity in a contract, such evidence cannot be used to contradict unambiguous contractual language. *See C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508–09, 817 P.2d 238, 242–43 (1991).

(20) We set forth the substantive provisions of the employment agreement signed by Casale and Padilla:

Per our meeting on Monday, March 8, 1993, the following benefit package will be available to you if you decide to be employed by RRA and contracted out to Sandia National laboratories:

RRA will pay you $24.00 per hour for every hour you work. Five weeks of vacation time which can be cashed out at the rate of salary in effect at the time of cash out or rolled over to the following year. Six days paid sick leave per year. Annual raises·will correspond to contractor's annual STBR increase (e.g. a 5% annual billing

increase will require a 5% hourly rate raise).

Lovelace medical insurance, family coverage at no cost to you with immediate enrollment which consists of medical, dental, vision, long term disability, $50,000 life insurance and $50,000 in accidental death.

401K is immediate enrollment, 100% vested, you can contribute up to 20% of your weekly salary.

RRA will submit you on RFQ# AF7430 at a STBR. not to exceed $35.00 per hour. This term of employment is for five years. If, however, the contract with Sandia shall terminate prior to that time, contractor will advise employee of contract termination within five days of contractor's notification.

(21) The district court rejected Padilla's reliance on this agreement. It entered the following conclusions of law:

> 2. The March 8 Employment Agreement requirement that RRA submit [Padilla] on [Sandia's] RFQ at a standard billing rate not to exceed $35 and at a direct labor rate of $24 per hour is vague and subject to two interpretations; first, that unless [Sandia] approved $35, RRA was not obligated to pay $24 per hour, or second, that as long as [Sandia] approved a reasonable standard billing rate, the rate paid would be $24 per hour. Had [Sandia] not selected [Padilla] for the Engineering Associate position, RRA would not have been obligated to employ [Padilla] or pay him a wage.

> 3. There was no meeting of the minds on the issue of the hourly wage to be paid [Padilla] and thus a valid contract to Pay $24 per hour was never formed.

Padilla challenges these conclusions, insisting that the March 8 document constitutes a valid, enforceable contract and that the private thoughts (the "minds") of the parties are legally irrelevant.

(22) We agree with Padilla to some extent. If Sandia had accepted RRA's proposal for a standard billing rate of $35, nothing in the record suggests any reason why the agreement between RRA and Padilla would not be enforceable. (With respect to the "meeting of the minds" language in the court's conclusions of law, see Gutierrez v. Sundancer Indian Jewelry, 117 N.M. 41, 52–53, 868 P.2d 1266, 1277–78 (Ct.App.1993) (Hartz, J., dissenting) (discussing authorities that recommend avoiding use of the term "meeting of the minds").)

(23) On the other hand, we disagree with Padilla's contention that there was no ambiguity in the March 8 agreement. The source of the ambiguity is the conditional nature of the agreement. As Padilla conceded at trial, if Sandia did not award the contract to RRA, RRA had no obligation to hire Padilla. The conditional nature of the agreement is implicit in the language of the agreement itself— the first paragraph indicates that the agreement governs Padilla's pay if he is "contracted out to Sandia" and the fifth paragraph notes that RRA will be submitting a response to a particular request for quotations. The ambiguity arises because the agreement does not set forth what RRA must do to obtain the contract with Sandia except to say that RRA will submit Padilla at a standard billing rate not to exceed $35 per hour. It is not clear from the agreement that RRA has any further responsibility to Padilla if it makes a submission at $35 per hour and Sandia rejects the submission. Must RRA then make a submission or accept a counterproposal at a standard billing rate of $34 an hour? How low must RRA go to meet its duty to Padilla? Must RRA submit a proposal that would eliminate any profit to it, or even cause a loss? Given this ambiguity, the district court properly considered evidence of the circumstances surrounding execution of the March 8 agreement to resolve whether the $24 hourly wage was contingent on the acceptance by Sandia of a $35 standard billing rate. Indeed, even without this ambiguity, the parol evidence rule ordinarily does not exclude evidence that a contract "should become operative only on the occurrence of a particular condition or contingency." Halliburton Co. v. McPheron, 70 N.M. 403, 405–06, 374 P.2d 286, 288 (1962); see Restatement § 217.

(24) Based on evidence of the surrounding circumstances, the court could determine that when Sandia rejected the $35 figure and

counterproposed $33.40, RRA was not obligated to accept the counteroffer from Sandia and pay Padilla $24 per hour. In other words, Sandia's acceptance of the $35 figure was a condition required for the agreement to go into effect, and Sandia's rejection of the figure relieved RRA of any contractual obligation to Padilla. Absent such an obligation, RRA could inform Padilla of Sandia's response and renegotiate with him. Padilla's acceptance of the $23 hourly rate would then create an enforceable contract.

(25) In short, the district court could properly find that Padilla had failed to satisfy his burden of proving that he had an enforceable contract requiring RRA to pay him $24 an hour. We therefore affirm the district court's judgment pursuant to Rule 1-041(B).

III. Conclusion

(26) For the above reasons, we affirm the judgment in favor of RRA and Rashkin on the written-contract claim. With respect to the oral-contract claim, we reverse the partial summary judgment and remand for further proceedings.

(27) **IT IS SO ORDERED.**

PICKARD and BOSSON, JJ., concur.

