2004 VT 29

## D. Michael Fromson v. State of Vermont, Department of Corrections and Celeste M. Girrell, Superintendent

[848 A.2d 344]

No. 03-262

Present: Amestoy, C.J., Dooley, Johnson, Skoglund and Reiber, JJ.

Opinion Filed April 2, 2004

*Sten M. Lium* of *Law Office of Jay Abramson*, St. Johnsbury, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *David K. Herlihy*, Special Assistant Attorney General, Montpelier, for Defendants-Appellees.

¶ 1. **Dooley, J.** Plaintiff, D. Michael Fromson, appeals two rulings by the Caledonia Superior Court in favor of defendants, Vermont Department of Corrections and Celeste M. Girrell, Superintendent of the Northeast Regional Correctional Center: (1) grant of defendants' motion for summary judgment dismissing plaintiff's claim for intentional infliction of emotional distress (IIED); and (2) denial of plaintiff's request to amend his complaint to add a prima facie tort claim because Vermont has not recognized such a tort. We affirm.

¶ 2. Plaintiff claims that from July 21, 1999 until mid-October 1999, defendants "engaged in a campaign to harass, intimidate, and oppress the plaintiff, for the purpose of breaking his spirit and rendering him unable or unfit or unwilling to continue in his employment." Plaintiff alleges that defendants engaged in this course of conduct in retaliation for plaintiff's reporting of several junior officers' complaints that two supervisors often reported to work under the influence of alcohol. In support of his allegation, plaintiff claims defendants: (1) filed work rule violations against him in bad faith; (2) investigated claims and allegations against him in bad faith; (3) discriminatorily altered his work schedule; (4) imposed unfair disciplinary action and other punishment; and (5) made remarks and insinuations calculated to threaten, harass, intimidate, and oppress him. Because this is an appeal from summary judgment we present the facts most favorably to plaintiff, giving him the benefit of all reasonable inferences. *Denton v. Chittenden Bank*, 163 Vt. 62, 63, 655 A.2d 703, 705 (1994). The facts come primarily from plaintiff's affidavit in opposition to summary judgment, supplemented by his deposition and his answers to interrogatories.

¶ 3. Plaintiff was employed by the State as a senior corrections officer in the Northeast Regional Correctional Center in Saint Johnsbury from November 1, 1993 until October 18, 1999. Up until July 1999, plaintiff had never been subject to employee disciplinary

actions. During that period, he received excellent evaluations, was frequently consulted by defendant superintendent, and was in line to become a supervisor. In the fall of 1998, plaintiff was selected as a facility steward for the Vermont State Employees Association (VSEA).

¶ 4. In mid-July 1999, several junior officers approached plaintiff as union steward and informed him that two supervisors were coming to work under the influence of alcohol. Plaintiff reported these concerns to defendant superintendent, who stated that she was pleased that the situation had been brought to her attention.

¶ 5. A few days after plaintiff made this report, he was summoned to meet with the superintendent and told that he should bring a union representative to the meeting. At the meeting, plaintiff was informed that the superintendent was investigating a complaint brought against him by a supervisor — not one of the supervisors plaintiff reported — for using demeaning language about a supervisor. Plaintiff became concerned that the alleged incident was being blown out of proportion and not being handled by the normal procedure of informing plaintiff's supervisor. Around this same time, plaintiff noticed that the other officers and supervisors were treating him less congenially than they had before he reported the supervisors.

¶ 6. Also around this time, plaintiff experienced several changes in his working conditions. First, plaintiff was no longer given breaks during his shift as he had been prior to July 1999. Second, during his shift, several of the more experienced officers were moved to more menial jobs, and replaced with less experienced officers, creating more demands on plaintiff. Third, plaintiff's name was removed from the acting supervisor's list. Finally, when plaintiff signed up for overtime shifts he would be reassigned to shifts he had not specified.

¶ 7. Around the end of July or the beginning of August, plaintiff's supervisor told him that he feared what other supervisors might do to him because he was not hostile to plaintiff. He told him that supervisors were meeting about plaintiff and telling trusted workers and inmates to watch him.

¶ 8. On August 25, 1999, the superintendent gave plaintiff a reprimand letter stating he had "demeaned the reputation of supervisors using profane and inflammatory language." The letter ordered plaintiff to refrain from using profanity. Plaintiff found this restriction to be unreasonable because all employees in the correctional center used profanity on a regular basis. The superintendent also told plaintiff that he had to respond to another complaint about his handling of a

disciplinary appeal. The complaint had been made by another corrections officer to the administrative supervisor. Plaintiff met with the administrative supervisor and explained his actions with regard to that complaint and two others from the officer.

¶ 9. A few days after this meeting, plaintiff "blew up" at his supervisor. Plaintiff then met with the superintendent to discuss this incident. Following this meeting, plaintiff was informed that he was going to be investigated to determine if at any time during his six years as a senior corrections officer his actions "reflected discredit upon the Department." Plaintiff was unaware of any other department employee ever being subject to this type of investigation.

¶ 10. In early fall 1999, plaintiff appealed the reprimand letter he received earlier that year. On October 13, 1999, plaintiff attended a grievance hearing before the department personnel officer. During the hearing, plaintiff was not allowed to see the witness statements or reports in the superintendent's file. At the conclusion of the hearing, plaintiff's grievance was denied. After the hearing, plaintiff was emotionally distraught. He did not return to work and was admitted to the VA hospital psychiatry wing.

¶ 11. On November 2, 2000 plaintiff filed a complaint against defendants for intentional infliction of emotional distress (IIED). On June 5, 2002, plaintiff filed a motion to amend his complaint to supplement the IIED allegations and add a prima facie tort claim. The trial judge allowed the amendments to the IIED allegations, but denied the motion to add a prima facie tort count because this cause of action has not been recognized in Vermont. On October 18, 2002 defendants filed a motion for summary judgment arguing, as they do here, that plaintiff's complaint did not allege actions sufficiently outrageous to support an IIED claim. Defendants further argued that even if the trial court found the alleged conduct sufficiently outrageous, sovereign immunity barred plaintiff's claim against the State and the superintendent in her official capacity and the doctrine of qualified immunity barred plaintiff's claim against the superintendent in her individual capacity.

¶ 12. In March 2003, the Caledonia Superior Court granted defendants' summary judgment motion. Plaintiff then, pursuant to V.R.C.P. 59(e), asked the trial court to amend its opinion and consider plaintiff's renewed motion to amend his complaint. The trial court granted plaintiff's motion in part, making minor edits to the order, and denied plaintiff's renewed motion to amend the complaint. This appeal followed.

¶ 13. In reviewing a grant of summary judgment we apply the same standard as the trial court. *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 17-18, 665 A.2d 580, 582 (1995). For a grant of summary judgment to be upheld, the moving party must show "that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law." *Denton*, 163 Vt. at 66, 655 A.2d at 706. If the nonmoving party alleges specific facts that raise a triable issue and establish a prima facie case, the trial court's finding will be reversed; however, if the nonmoving party fails to establish an essential element of his or her claim, the ruling will be affirmed. *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 79, 807 A.2d 390, 395 (2002).

¶ 14. To sustain a claim for IIED plaintiff must show defendants engaged in "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Sheltra v. Smith*, 136 Vt. 472, 476, 392 A.2d 431, 433 (1978). Plaintiff's burden on this claim is a "heavy one" as he must show defendants' conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Dulude*, 174 Vt. at 83, 807 A.2d at 398. The court makes the initial determination of whether a jury could reasonably find that the alleged conduct satisfies all the elements of an IIED claim. *Jobin v. McQuillen*, 158 Vt. 322, 327, 609 A.2d 990, 993 (1992) (citing Restatement (Second) of Torts § 46, cmt. h (1965)).

¶ 15. The trial court ruled that the evidence plaintiff presented did not show conduct "so outrageous in character and so extreme in degree to go beyond all possible bounds of decency and tolerable conduct in a civilized community." In reviewing this determination, we note that our IIED cases have often been brought by employees against employers for actions occurring in the employment relationship in the workplace. Many have involved events somewhat similar and comparable to those alleged by plaintiff here. For example, in *Denton v. Chittenden Bank*, plaintiff alleged that his supervisor engaged in a pattern of harassing and demeaning conduct that eventually caused plaintiff to have a nervous breakdown. We held:

> We have never extended liability to "mere insults, indignities, threats, annoyances, petty oppressions, or other triviali-

ties." See Restatement [(Second) of Torts] § 46 cmt. d. Because laws proscribing conduct must be specific enough to give fair notice of what conduct will give rise to liability, we decline, on these facts, to extend liability to a series of indignities. Absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are in themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous.

163 Vt. at 66-67, 655 A.2d at 706. In *Baldwin v. Upper Valley Services, Inc.*, 162 Vt. 51, 644 A.2d 316 (1994), plaintiff alleged that he was fired for misconduct under suspicious circumstances after he had filed wage and hour and sexual harassment complaints. We found that he had not made out a claim for IIED, emphasizing that defendants' motives could not establish the tort:

Plaintiff argues that the court, in ruling on the summary judgment motion, inappropriately assessed the perceptions and motivations of UVS. In effect, plaintiff suggests a purely subjective test for outrageousness, based not on what defendant's agents or employees did or said, but on what plaintiff personally believed motivated their conduct. Established law, however, posits an objective test for outrageousness: a plaintiff must demonstrate legal harm resulting from inflicted distress so severe that no reasonable person could be expected to endure it. Plaintiff has not alleged particular susceptibility to stress.

*Id.* at 57, 644 A.2d at 319 (citations omitted).

¶ 16. In *Gallipo v. City of Rutland*, 163 Vt. 83, 656 A.2d 635 (1994), plaintiff firefighter filed a complaint under the Vermont Fair Employment Practices Act that he had been passed over for a promotion because of handicap discrimination. Thereafter, he was assigned menial tasks at the firehouse and received disciplinary memoranda for the first time in his long work career. He brought an action for IIED, among other claims. We held that the allegations fell "far short" of those necessary to show IIED: the menial tasks were routine duties, albeit normally assigned to more junior firefighters, and the disciplinary actions could not be characterized as outrageous conduct surpassing the bounds of decency. *Id.* at 94-95, 656 A.2d at 643; see also *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 498-99, 671 A.2d 1249, 1256-57 (1995) (summary firing of long-serving employees

without giving grounds does not constitute IIED); *Murray v. St. Michael's College,* 164 Vt. 205, 212, 667 A.2d 294, 300 (1995) (no prima facie IIED claim where plaintiff claimed defendants retaliated against him for filing a workers' compensation claim by "badgering him to come back to work [although he was injured], changing his employment duties and responsibilities, requiring him to work night shifts in breach of a previous agreement, changing his work hours, giving him unfairly low job evaluations, and challenging his right to receive workers' compensation benefits," and finally demoting him for misconduct); *Dulude,* 174 Vt. at 83, 807 A.2d at 398 (plaintiff's termination and disciplinary action taken against her not sufficiently severe to establish IIED claim).

¶ 17. As in *Denton,* plaintiff here is trying to combine a series of events without showing a significant outrageous act. As in *Gallipo, Baldwin* and *Murray,* plaintiff relies upon his perception of defendants' motives underlying the disciplinary actions. As in *Gallipo,* plaintiff relies on changes in workplace assignments and practices that disadvantaged him. For the reasons given in those decisions, we do not believe that plaintiff has shown outrageous conduct that meets the threshold standard for an IIED claim.

¶ 18. In reaching our conclusion, we reject plaintiff's argument that we can uphold his claim based on his assertion that the actions taken were improperly motivated by retaliation for plaintiff's complaint against the supervisors. The plaintiffs in the cases cited above alleged improper motives, and yet, as noted, in each instance we declined to find outrageous conduct based solely on the alleged illegal motives underlying the conduct. See Restatement (Second) of Torts § 46, cmt. d (1965) (conduct is not outrageous merely because defendant acted with tortious or criminal intent); *Aquavia v. Goggin,* 208 F. Supp. 2d 225, 237 (D. Conn. 2002) (motives underlying employment decisions are generally not relevant in determining whether acts are sufficiently outrageous to meet elements of intentional infliction of emotional distress; rather, acts themselves must be outrageous). But cf. *Dale v. City of Chicago Heights,* 672 F. Supp. 330, 333 (N.D. Ill. 1987) (plaintiffs survived motion to dismiss on IIED claim alleging that defendants engaged in racially motivated course of conduct that included threats, harassment, abuse of power, and termination of plaintiffs' business).

¶ 19. This last point brings us directly to plaintiff's second argument on appeal — that plaintiff can establish liability based on improper motive using the alternative cause of action of prima facie tort. As described above, plaintiff attempted to amend his complaint to allege this liability theory. The proposed amendment alleged no new facts, but claimed generally that defendants' actions were intentional and malicious, were engaged in to injure plaintiff, were generally culpable, and were not justifiable. The trial court denied plaintiff's motion to amend because we have not previously recognized a cause of action for prima facie tort.

¶ 20. Plaintiff's theory is based upon § 870 of the Restatement (Second) of Torts, which provides:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

The cause of action described in § 870 is commonly called "prima facie tort." Although some states have relied upon the general principle of § 870, only a handful have adopted prima facie tort as an independent cause of action. See *Stock v. Grantham*, 964 P.2d 125, 136 (N.M. Ct. App. 1998) (prima facie tort recognized in a few jurisdictions).* As the superior court observed, we have never decided whether we would recognize liability based on § 870.

¶ 21. We need not decide whether we would recognize prima facie tort because, even if we did so, plaintiff could not prevail in this case. Although plaintiff does not explain in detail exactly how he has shown each of the elements of prima facie tort, he has explained that this theory "is based on the exact same facts" as his claim of IIED. We interpret his argument to be that he can make up for the deficiencies in his ability to prove the elements of IIED by relying on defendants' alleged improper motives under this alternative theory.

¶ 22. The courts in each of the main jurisdictions that have recognized liability based on prima facie tort — Missouri, New Mexico and New York — have struggled with the situation plaintiff presents here,

---

* Plaintiff relies upon 10 S. Speiser, C. Krause & A. Gans, The American Law of Torts § 35:8 (1993), for the proposition that at least 21 states have recognized prima facie tort. An examination of the cases cited in the treatise shows, however, that most have not adopted this theory of liability or have adopted it in circumstances wholly different from those before us.

that is, an attempt to use prima facie tort to make up for the inability to prove an element of a specific intentional tort. In each, the courts have indicated that prima facie tort may not be used in this way. In New York, the state with the greatest number of reported cases, the Court of Appeals originally held that a plaintiff could plead an intentional tort and prima facie tort as alternatives because "there may be instances where the traditional tort cause of action will fail and plaintiff should be permitted to assert this alternative claim." *Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n*, 343 N.E.2d 278, 285 (N.Y. 1975). Later cases have made clear, however, that prima facie tort may not be used to evade the "essential elements of traditional tort." *Belsky v. Lowenthal*, 405 N.Y.S.2d 62, 65 (App. Div. 1978). The New York law is best summarized in *National Nutritional Foods Ass'n v. Whelan*, 492 F. Supp. 374 (S.D.N.Y. 1980), a case in which plaintiff relied upon prima facie tort because it could not show all the elements of defamation:

> Strictly stated, the theory suggests a rule both reasonable and manageable: a prima facie tort may not rest upon conduct that is well within the area of activity meant to be regulated by a traditional tort, and which is insufficient to establish that tort.
>
> . . . .
>
> ... The defamation counts are not only insufficient, they are insufficient for reasons that reflect policy determinations implicit in New York libel law to protect the forms of expression adopted by defendants. It would make no sense, for example, to deem certain expressions immune from suit as libel, and then find them sufficient in the identical factual context to constitute a prima facie tort; or to make truth an absolute defense in libel and defamation suits, but then to allow a prima facie tort claim based on the same facts merely because defendant was motivated by ill will and caused economic injury; or to prohibit actions based on class defamation, and then to allow such actions under a different theory . . . . In short, the underlying reasons that justify dismissal of plaintiffs' defamation claims apply with equal force to their claim of prima facie tort.

*Id.* at 383-84.

¶ 23. The decisions in Missouri and New Mexico are similar. See *Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 553 (Mo. Ct. App. 1983) ("If there are categories of legally protectible interests which are now redressed, but inadequately so, the much preferable course is to revise traditional doctrine so as to protect the interest which has gone unprotected."); *Martinez v. N. Rio Arriba Elec. Coop.*, 51 P.3d 1164, 1170 (N.M. Ct. App. 2002) (referring to IIED, can't use prima facie tort to evade stringent requirements of other torts); *Stock*, 964 P.2d at 136-37 (same). The court in *Stock* added that: "we would not recognize a claim of intentional infliction of emotional distress in the absence of the outrageous conduct required for that tort, even if the plaintiff relabeled the cause of action as 'prima facie tort.'" *Id.* at 137.

¶ 24. We also note that many courts have not adopted prima facie tort because the application of the doctrine arises in cases where the plaintiff is attempting to evade the requirements of a specific intentional tort. See, e.g., *Cabanas v. Gloodt Assocs.*, 942 F. Supp. 1295, 1311 (E.D. Cal. 1996) (California courts would not recognize prima facie tort in a case where the conduct in issue is "adequately governed by existing torts"); *Rutledge v. Phoenix Newspapers, Inc.*, 715 P.2d 1243, 1246 (Ariz. Ct. App. 1986), *overruled on other grounds by Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 784 (Ariz. 1989) (plaintiff's interests adequately protected by torts of IIED and invasion of privacy so that prima facie tort would not apply even if court adopted it); *Taylor v. Metzger*, 706 A.2d 685, 701 (N.J. 1998) (court would not adopt prima facie tort in case where "essential elements of an established and relevant cause of action are missing.").

■ ¶ 25. We understand plaintiff to be arguing that we should recognize prima facie tort as a cause of action in exactly the same circumstances present in *Stock*. That is, plaintiff argues that we should make tortious conduct not outrageous under our IIED law as long as we conclude that defendant had an improper motive for the conduct, here to retaliate for plaintiff's complaint that certain supervisors were appearing for work under the influence of alcohol. The result would be to eviscerate the carefully constructed requirements of IIED. Moreover, any claim of emotional distress damages would end up going to a jury trial because motive can only be inferred from surrounding circumstances. Even if we were to make such a change in our law, we would do it by redefining the elements of IIED and not by adopting a new tort theory that would accomplish the same result. On this record, we decline to adopt prima facie tort.

¶ 26. The superior court correctly concluded that we would not recognize prima facie tort on this record. Even if it had allowed the amendment of the complaint to allow a count of prima facie tort, the count would have to be dismissed. Since we affirm the trial court's summary judgment we do not reach the other grounds for affirmance raised by defendants.

*Affirmed.*