*Grace v. Green Mountain Coffee Roasters, Inc.*, No. 160-3-13 Wncv (Teachout, J., May 14, 2015)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 160-3-13 Wncv** |

**KATHRYN E.S. GRACE AND ROBERT C. GRACE,**
    **Plaintiffs**

    **v.**

**GREEN MOUNTAIN COFFEE ROASTERS, INC., ET AL.**
    **Defendants**

**DECISION re:**
**Keurig's Motion for Summary Judgment (MPR #21)**
**Pilgrim's Motion for Summary Judgment (MPR #22)**
**Kingsbury's Motion for Summary Judgment (MPR #23)**
**Grenier's Motion for Summary Judgment (MPR #24)**
**Pilgrim/Keurig's Motion for Summary Judgment re Emotional Damages (MPR #25)**
**Pilgrim/Keurig's Motion for Summary Judgment re Fees and Punitives (MPR #26)**

    Plaintiffs Kathryn and Robert Grace own a home in Waterbury that was severely damaged by flooding in the course of Tropical Storm Irene.[1] They allege that acts and omissions by Defendants related to the deposit of "fill" in the floodplain nearby made the flooding at their home worse than it would have been and caused property damage they otherwise would not have suffered.[2] They seek compensation for the damage corresponding to that increased flooding. They also seek compensation for emotional harm and attorney fees, and they seek punitive damages. On the "increased flooding" claim, a threshold controversy is causation and damages: whether the Graces have sufficient evidence that increased flooding, if any, actually caused damage to their home that would not have occurred otherwise.

    The material facts are largely undisputed. Defendant Keurig Green Mountain, Inc. (Keurig), formerly known as Green Mountain Coffee Roasters, Inc., has its headquarters in Waterbury at the Pilgrim Industrial Park, which is owned by Defendant Pilgrim Partnership, LLC (Pilgrim).[3] In 2010, Keurig and Pilgrim jointly applied for a permit to build a small road connecting the industrial park to an adjacent office complex. The permit was granted. Defendant Grenier Engineering, P.C. (Grenier) was hired to design the project. Defendant Kingsbury Construction Co., Inc. (Kingsbury) was hired to build the road. Part of the project involved the removal of excavated earth. Pilgrim's principal, without having necessary permit authority to do so, directed Kingsbury to deposit some of the fill on so-called Parcel B. Parcel B,

---

[1] The Graces have withdrawn all claims related to two rental properties that they also own in Waterbury.

[2] The Graces characterize their legal claims as sounding in negligence, trespass, and nuisance.

[3] Initially, Keurig filed a cross-claim for indemnity against Pilgrim. That claim was later withdrawn and both parties now are represented by the same counsel.

owned by Pilgrim, is in the floodplain and is adjacent to the Graces' home. The Graces' many objections to the fill did not result in its removal before Tropical Storm Irene struck in late August 2011. The Graces' home suffered severe water damage in that flooding.

The Graces claim that each defendant is liable in some manner for ordering the fill to be placed on Parcel B, failing to prevent its placement on Parcel B, or failing to ensure that it was removed from Parcel B before Irene struck. Common to all such claims is the question of whether the Graces have sufficient evidence of causation and damages.

*Causation and damages corresponding to "increased flooding"*

With regard to causation and damages, the Graces have the ultimate burden at trial of showing (1) that the fill caused increased flooding at their home, (2) that the increased flooding caused water damage to their home that would not have occurred otherwise, and (3) the amount of those increased damages. On summary judgment, the Graces have the burden of coming forward with evidence at least showing a triable case on these issues. The difficult circumstance is that there is no dispute that the Graces' home would have been severely damaged in Irene flooding regardless of the increased flooding that they attribute to the fill on Parcel B. Teasing apart what actually happened with the fill in place in relation to what would have happened if it had not been put there requires expert support. These are not matters within the common knowledge of laypersons. See *Taylor v. Fletcher Allen Health Care*, 2012 VT 86, ¶¶ 9–10, 192 Vt. 418.

The Graces' principal experts with regard to causation and damages are Donald Marsh, a professional engineer, Evan Fitzgerald, a watershed and river scientist, and John Hudson, a self-described architectural designer (not a licensed profession).

In his report, Mr. Fitzgerald opined that the fill on Parcel B directed floodwater toward the back of the Graces' home and increased its velocity. He offered the opinion that this caused a higher exterior water level where the flow hit the house (in the back) and a lower level in the front whereas the levels (front and back) would have been more even without the fill. However, Mr. Fitzgerald retracted these opinions at deposition upon conceding that the "model resolution" of his calculations was insufficient to determine the "micro-scale hydraulics" at the Graces' home.

After the summary judgment motions challenging causation and damages were filed, the Graces submitted a supplemental affidavit from Mr. Fitzgerald.[4] In it, Mr. Fitzgerald explains that after his deposition, and based on certain assumptions, he ran calculations at the correct model resolution to show the micro-scale hydraulics at the back of the Grace home. Based on those calculations, he now opines that "the fill increased water elevation at the back of the Grace residence by approximately 2 3/4 inches." Affidavit of Evan P. Fitzgerald ¶ 21 (filed Dec. 12, 2014). "The differential in water elevations between the back of the house and the front of the house due to the . . . fill was approximately 5 inches." *Id.*

---

[4] Defendants object that this affidavit is untimely and prejudicial. Because the court concludes that Mr. Fitzgerald's supplemental affidavit does not change the outcome on the summary judgment motions, the court does not need to address Defendants' objection.

Mr. Marsh found that the first floor of the Graces' home is level, and that the depth of water inside on the first floor at the front of the house reached 3/4 of an inch. He found that it reached 2.6 inches higher inside at the back of the house.

The causation and damages issues in this case depend on showings that the water level inside the house reached a higher level due to the fill than otherwise would have occurred, *and* that the higher level caused damage that otherwise would not have occurred.

Mr. Fitzgerald found that the exterior water level at the back of the house was much higher than at the front of the house due to the direction and velocity of the flow. He did not offer an expert opinion on the interior level of water, much less with the fill and without the fill, or how the exterior levels would have affected the interior levels. Mr. Marsh found a large disparity in internal water levels at the front and back of the house on the first floor. He did not offer any opinion explaining that disparity or what the interior water levels would have been without the fill.

The closest the record gets to a showing of causation is a statement in Mr. Fitzgerald's post-deposition affidavit: "Taking as true Pilgrim Partnership's statement that, without consideration of floodflow directionality or velocity, the . . . fill displaced 57,000 gallons of storage capacity and increased flooding at the Grace residence by 3/4 of an inch . . . a reasonable person could conclude that but for the . . . fill, no water would have entered into the first floor of the Grace residence." Affidavit of Evan P. Fitzgerald ¶ 23. However, the premise, the 57,000 gallons of displaced storage capacity, is not being offered as Mr. Fitzgerald's expert opinion. He discredits the methodology that produced that displacement figure. The purported effect, water would not have entered the first floor, appears to be offered merely as a layperson inference. There is no explanation of how Mr. Fitzgerald's calculations regarding exterior water levels would result in increased interior water levels. The Graces offer no expert opinion on what the internal water was with the fill in place in relation to what it would have been without the fill.

The Graces appear to assume without expert support that a higher water level at the exterior of the back caused by the flow of water colliding with the exterior wall of the house would neatly translate to a higher water level at the interior of the back of the house, that water thus broached the first floor, and that all damages to the first floor otherwise would not have occurred. There is no expert opinion explaining the manner in which water would have entered the house (e.g., seeping through walls, under doors, etc.) and thereby explaining the disparity in water levels inside the Grace home, nor any expert opinion connecting those effects to fill on Parcel B nor explaining why water otherwise would not have broached the first floor.

Even if there were such evidence, there is no expert support for the proposition that an increased interior water level caused damages that otherwise would not have occurred. On this issue, the Graces appear to assume that all damages to the first floor are attributable to increased flooding caused by the fill. There is no expert opinion to that effect. Mr. Hudson, whose expertise is unclear, issued a report, apparently largely crafted by Ms. Grace, calculating the total damages to the first floor of the Grace home. He did not, however, attempt to distinguish damages caused by allegedly increased flooding versus damages that would have been caused by

3

Irene flooding alone. For all any layperson might know, a somewhat higher or lower interior water level would have made no difference at all to the resulting water damage.

In an affidavit filed December 12, 2014, Daniel Wetmore, a carpenter who did some work on the house in Irene's aftermath, recounts his observation that the water damage was worse in the back of the house than in the front (on the first floor), where it was relatively minor.[5] However, Wetmore does not offer any opinion connecting his observations of damage on the first floor to flood levels caused by the fill in relation to the damage that would have been experienced anyway.

The record lacks sufficient expert testimony to reasonably permit a jury to find that the placement of fill on Parcel B worsened interior water levels at the Graces' home and caused damage that otherwise would not have occurred. Defendants are entitled to summary judgment on this issue.

Because the court so rules, it is unnecessary to address other arguments raised by Defendants in opposition to liability for increased flooding.

*Emotional damages*

In the complaint, the Graces seek damages for "emotional distress caused by Defendants' negligence." Defendants seek summary judgment on this claim, characterizing it as either a negligent infliction of emotional distress claim or simply as seeking emotional damages caused by negligence without bodily harm or the risk thereof. In response, the Graces assert that their claim is intentional infliction of emotional distress.[6] An affidavit attached to their opposition provides the allegations offered to support this claim. In short, they claim that Defendants' conduct in placing the fill on Parcel B without lawful authority to do so, refusing to remove it in a timely manner, and failing to notice Plaintiffs of certain permit proceedings, and some impolite or rude statements and gestures toward Ms. Grace were extreme and outrageous and caused her to suffer emotional distress.

The tort of intentional infliction of emotional distress is described in the Restatement (Second) of Torts as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts § 46(1); see *Sheltra v. Smith*, 136 Vt. 472, 475–76 (1978) (adopting § 46 in Vermont). Courts often condense the element of extreme and outrageous conduct to simply outrageous conduct. The third Restatement clarifies that these are separate issues.

---

[5] Defendants object that this affidavit is untimely and prejudicial. Because the court concludes that Mr. Wetmore's affidavit does not change the outcome on the summary judgment motions, the court does not need to address Defendants' objection.

[6] The language of the amended complaint does not give fair notice of an intentional infliction of emotional distress claim. Because the proposed IIED claim lacks sufficient evidentiary support to survive summary judgment, the court does not need to consider the potential amendment of the complaint to include it.

4

The adjectives "extreme" and "outrageous" are used together in a fashion that might suggest that each merely emphasizes the other, rather than serving a distinct role. However, some conduct that may be outrageous—for example, marital infidelity—is sufficiently common that it could not be characterized as extreme (although today it may also not be outrageous). Similarly, some extreme conduct—climbing Mt. Everest, for example—is not outrageous. Thus, this double limitation, "extreme and outrageous," requires both that the character of the conduct be outrageous and that the conduct be sufficiently unusual to be extreme.

Restatement (Third) of Torts: Phys. & Emot. Harm § 46 cmt. d. The standard is high. "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'" *Denton v. Chittenden Bank*, 163 Vt. 62, 66 (1994) (quoting Restatement § 46 cmt. d). "The court makes the initial determination of whether a jury could reasonably find that the alleged conduct satisfies all the elements of an IIED claim." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395. A plaintiff cannot rely upon his perceptions of the defendant's motives to establish the tort—the test is objective. *Id*. ¶¶ 17, 15; *Baldwin v. Upper Valley Services, Inc.*, 162 Vt. 51, 57 (1994).

Applying these standards to this case, and assuming the truth of the Graces' allegations, the court concludes that a finder of fact could not reasonably find that Defendants' alleged conduct was sufficiently extreme or outrageous to reasonably warrant liability for IIED. The allegations also are insufficient for any finding that Defendants intended to cause Ms. Grace emotional harm or that the circumstances were such that they should have known that they were causing her emotional harm and persisted nonetheless. Land use disputes sometimes boil over into fractious and emotionally charged events. The allegations describe these sorts of uncivil but unremarkable interactions. They do not describe conduct so extreme and outrageous as to warrant liability for emotional harm untethered to bodily injury.

*Attorney fees*

The claim for attorney fees is based on an exception to the American Rule for dragging a party into unnecessary litigation in bad faith. See *Cameron v. Burke*, 153 Vt. 565, 576 (1990) ("Exceptional cases include instances where a litigant acts 'in bad faith' or 'vexatiously' and where a litigant's conduct is 'unreasonably obdurate or obstinate.'" (citation omitted)). The Graces filed this case and have not prevailed. There is no basis for an award of attorney fees.

*Punitive damages*

With no entitlement to compensatory damages, there can be no basis for an award of punitive damages. See *Pion v. Bean*, 2003 VT 79, ¶ 44, 176 Vt. 1 ("court can award punitive damages only if it has awarded compensatory damages").

**ORDER**

For the foregoing reasons: Defendants' summary judgment motions (MPRs 21–26) are *granted*.

A review of the Amended Complaint shows that there are no remaining claims in the case. Other motions filed after the oral argument held on March 16, 2015 are moot.

Dated at Montpelier, Vermont this _____ day of May 2015.

_____
Mary Miles Teachout
Superior Judge