Vermont Superior Court
Filed 01/11/24

SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 23-CV-02477

Derek Chase, MD v. Gifford Medical Center, Inc.

Opinion and Order on Defendant's Partial Motion to Dismiss

Plaintiff Derek Chase is a physician who was formerly employed by Defendant Gifford Medical Center, Inc. His employment was terminated, and he brought this Complaint against Defendant seeking damages and declaratory relief in connection with his employment and termination. Dr. Chase is represented by Christina Nolan, Esq., and Heather Ross, Esq. Gifford is represented by Elizabeth Rattigan, Esq., and Brendan Sage, Esq.

Pending before the Court is Gifford's partial motion to dismiss. Gifford seeks dismissal of Plaintiff's claim asserting intentional infliction of emotional distress (IIED). Gifford contends that the facts alleged do not rise to level needed to state an IIED claim. It also moves to dismiss Plaintiff's claims seeking declaratory relief. Gifford argues primarily that those claims are moot. Dr. Chase opposes the motion. Both sides have presented written and oral arguments to the Court. Based on those submissions, the Court makes the following determinations.

I       The Legal Standard

While the United States Supreme Court has relaxed somewhat the standard for granting motions to dismiss under Fed. R. Civ. P. 12(b)(6), *Bell Atlantic Corp. v.*

1

*Twombly*, 550 U.S. 544, 560–63 (2007), the Vermont Supreme Court has proceeded in the opposite direction with regard to motions under Vt. R. Civ. P. 12(b)(6). The Vermont Supreme Court disfavors motions to dismiss. *Ass'n of Haystack Prop. Owners v. Sprague*, 145 Vt. 443, 446–47 (1985) (such motions are to be "rarely granted"). "Dismissal under Rule 12(b)(6) is proper only when it is beyond doubt that there exist no facts or circumstances consistent with the complaint that would entitle Plaintiff to relief." *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575, 576 (mem.) (citing *Union Mut. Fire Ins. Co. v. Joerg*, 2003 VT 27, ¶ 4, 175 Vt. 196, 198)).

In considering a motion to dismiss, the Court "assume[s] that all factual allegations pleaded in the complaint are true, accept[s] as true all reasonable inferences that may be derived from plaintiff's pleadings, and assume[s] that all contravening assertions in defendant's pleadings are false." *Mahoney v. Tara, LLC*, 2011 VT 3, ¶ 7, 189 Vt. 557, 559 (mem.) (internal quotation, brackets, and ellipses omitted). It is not required to accept bald legal conclusions unsupported by any factual allegations, however. *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 10, 184 Vt. 1, 9.

As a consequence, the threshold a plaintiff must meet to satisfy the notice-pleading standard under Vt. R. Civ .P. 8 is "exceedingly low." *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 2022 VT 45, ¶ 40 (*citing Bock*, 2008 VT 81, ¶ 4, 184 Vt. at 576 (mem.)).

II. <u>Dr. Chase's Facts</u>

As alleged in the Complaint, the facts are as follows. Dr. Chase is an orthopedic surgeon who started working at Gifford in 2017. In 2019, he received a

2

"glowing medical staff performance evaluation." His most recent employment agreement was for a one year, with an automatically renewable term, which could be terminated without cause on 90 days' notice. The agreement obligated Gifford to provide Dr. Chase with professional liability insurance during his employment.

In late 2020, Dr. Chase refused to continue working on a surgical fracture table that he deemed unsafe, and he raised other patient care and safety concerns with Gifford. Gifford reacted with hostility. Two weeks later, Gifford threatened to subject Dr. Chase to a peer review or a performance improvement plan for medical charts that Gifford falsely claimed were deficient. In June 2021, Dr. Chase reiterated his patient confidentiality concerns. A week later, he was placed on a performance improvement plan for being delinquent with medical charts, though there was, in fact, no tardiness. The following month, he was told that he would be put on another improvement plan for the same (baseless) reason.

A few months later, Dr. Chase was asked to attend a peer review meeting at which it was alleged, falsely, that he had failed to write follow-up orders for a specific patient. He was told he would be subject to yet another improvement plan as well as "open-ended monitoring of his charts." Shortly thereafter, Gifford filed a claim against Dr. Chase with the Vermont Medical Practice Board (the "Board") that had no legitimate basis.

Dr. Chase hired legal counsel. Gifford later withdrew the performance review plan, the peer review, and its complaint with the Board.

On April 8, 2022, Gifford terminated Dr. Chase's employment. It threatened to terminate his liability insurance and suspend his clinical privileges immediately. To embarrass and humiliate Dr. Chase, Gifford falsely told third parties that he was "escorted out of the building upon his termination." Gifford denied him the ability to transition his patients' care. These actions caused treatment to be delayed for Dr. Chase's patients, who had to be transferred to other facilities, which made them dissatisfied and upset with Dr. Chase. Gifford also destroyed Dr. Chase's personal health records, which were in his office, along with destroying gifts of appreciation Dr. Chase had received from past patients. All of these acts caused Dr. Chase substantial emotional upset and damaged his professional reputation.

III.    Intentional Infliction of Emotional Distress

Gifford argues that the allegations of the Complaint, even indulging all inferences in their favor, fall short of the extreme conduct that is necessary to support an IIED cause of action. Dr. Chase counters that this was no mere termination. He contends that Gifford's conduct was extreme and intolerable and caused him extreme emotional distress.

To survive dismissal of an IIED claim, a plaintiff must allege: "(1) conduct that is extreme and outrageous; (2) conduct that is intentional or reckless; and (3) conduct that causes severe emotional distress." *Baptie v. Bruno*, 2013 VT 117, ¶ 24, 195 Vt. 308, 318. To satisfy the outrageousness element, the defendant's behavior must "surpass the bounds of decency that can be tolerated in a civilized society." *Fromson v. State*, 2004 VT 29, ¶ 15, 176 Vt. 395; *see also Restatement (Second) of*

4

*Torts* § 46, cmt. d (1965).  A plaintiff must also allege that the defendant's actions caused him to suffer "distress so severe that no reasonable person could be expected to endure it."  *Baldwin v. Upper Valley Services, Inc.*, 162 Vt. 51, 57 (1994).

In the specific context of employment, "mere termination of employment will not support a claim for intentional infliction of emotional distress."  *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296 (1990); *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 56 (1994).  Similarly, conduct that often attends termination of employment, including "insult, indignities, and annoyances" do not rise to the level of extreme and outrageous conduct.  *Denton v. Chittenden Bank*, 163 Vt. 62, 66–67 (1994).  But, "if the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-a-vis plaintiff it may provide grounds for the tort action."  *Crump*, 154 Vt. 296.  Lastly, a plaintiff may not bundle together separate acts to increase by multiplication the level of the alleged misconduct.  There must be at least one incident that "transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace."  *Fromson*, 2004 VT 29, ¶ 15, 176 Vt. at 400.

Here, while Dr. Chase alleges various alleged wrongful acts towards him over time, the Court's focus is on a single event, his termination.  In that regard, Dr. Chase claims that his termination was augmented by the highly outrageous additional conduct of Gifford, which included:

- Telling him he was immediately banned from the hospital;
- Telling him he could not coordinate the transfer of care for his patients;

5

- Destroying his personal property in his office, which included cards/gifts of thanks from grateful patients;

- Destroying his own personal health-care records from his office;

- Telling him that his malpractice insurance was being immediately ended; and

- Falsely telling third parties that Dr. Chase had to be escorted off the hospital grounds.

Though the standard for stating an IIED claim is exacting, at this stage, Dr. Chase enjoys the benefit that all factual allegations and all reasonable interferences drawn from them are construed wholly to his benefit. In keeping with that, the Court must assume that the conduct described above is highly unusual for a termination in the medical profession, that telling third parties of being escorted from the premises could impact Dr. Chase's standing in the greater community and for other employment, that denying him the ability to transition care for his patients would cause him extreme concern for the ongoing safety of his patients, that destruction of personal health records and personal property of the type described would also cause a person great emotional pain. This conduct, on the present record, cannot be assumed to be *de rigueur* in this context. Viewed in Dr. Chase's favor, such conduct goes well beyond mere indignities associated with a standard termination. The alleged actions reflect the type of "oppressive conduct and abuse of a position of authority vis-a-vis plaintiff" that *Crump* suggests can suffice to establish IIED. *Crump*, 154 Vt. 296.

The motion to dismiss the IIED claim is denied.

6

IV.    Declaratory Judgment Claims

Gifford also moves to dismiss Counts VII to IX of the Complaint for failure to state claims and/or for mootness.  In those Counts, Dr. Chase seeks declaratory relief concerning the report Gifford made about him to the Board and Gifford's institution of a peer review concerning him.  Gifford maintains that it was required to make the report to the Board and that, in any event, as both the report and the peer review were withdrawn, no live controversy remains between the parties.

As to the assertion that it was required to make the report, the record does not support that conclusion.  Gifford argues that it had to report Dr. Chase to the Board under 26 V.S.A. § 1317(b)(3)(C).  That provision requires a hospital to file a report identifying:

> (3) Acts or omissions of the licensee that occur in the course of practice and result in one or more of the following:
>
> .   .   .
>
> (C) Written discipline that constitutes a censure, reprimand, or admonition, if it is the second or subsequent censure, reprimand, or admonition within a 12-month period for the same or related acts or omissions that previously resulted in written censure, reprimand, or admonition.  The same or related acts or omissions includes similar behavior or behavior involving the same parties, or both.  Oral censure, oral reprimand, and oral admonition are not considered reportable disciplinary actions, and notation of an oral censure, oral reprimand, or oral admonition in a personnel or supervisor's file does not transform the action from oral to written.

Accordingly, to justify a mandatory report, there must have been at least two events of a similar nature leading to written discipline within a 12-month period.

7

Based on the Complaint, in December 2020, Gifford threatened to subject Dr. Chase to a peer review or performance improvement plan for allegedly delinquent charts. In July 2021, Gifford actually imposed such a performance plan. In August 2021, Gifford threatened to impose a second improvement plan for the same reason—but it did not. These are the "two" incidents of written discipline that Gifford claims required it to file the report with the Board. Plainly, however, there was one incident that happened; the other was only threatened. Gifford's claim that it had no choice but to file the report has no merit based on the allegations.

Gifford also contends: "There is no dispute that the report to the Board and the peer review are over and done with, and that they no longer have any potential to affect any rights of Plaintiff." On that basis, Gifford maintains the issues are moot. The Court disagrees.

"The Declaratory Judgment Act allows parties who have a dispute within a court's jurisdiction to petition that court for declaratory relief at an early stage of the proceedings; however, the Act does not increase or enlarge the jurisdiction of the court over any subject matter or parties." *Vermont State Employees' Ass'n, Inc. v. Vermont Crim. Just. Training Council*, 167 Vt. 191, 194 (1997); *see also Anderson v. State*, 168 Vt. 641, 643 (1998) ("The purpose of a declaratory judgment is to provide a declaration of rights, status, and other legal relations of parties to an actual or justiciable controversy."). "A declaratory judgment will issue if it serves the useful purpose of clarifying the legal relations of the parties or terminating the insecurity

8

and uncertainty of the controversy." *Coop. Fire Ins. Ass'n of Vermont v. Bizon*, 166 Vt. 326, 331 (1997).

Here, at page 8 of Gifford's Reply Memorandum, it concedes that the allegations of a sham report and peer review process would be relevant to Plaintiff's IIED claim. Though Gifford presumed that the IIED claim would be dismissed, it has not been. On this basis alone, the claims for declaratory relief in that regard present an ongoing controversy that cannot be dismissed at this juncture.

Gifford further argues that there is no justiciable controversy over the report and peer review process in relation to Dr. Chase's other claims. These arguments are to some extent nuanced and depend on Gifford's view of the facts and policy positions as to relevant statutory provisions. They will be better addressed once the evidence is developed. It suffices to say that, at this point, the Court cannot conclude the allegedly false report to the Board and sham peer review would have no ongoing relevance to a number of Plaintiff's other claims as well as his IIED cause of action.

The Court appreciates the policy concerns raised by Gifford in connection with preserving the immunity of such professional review processes. The concerns are legitimate and significant. But those protections are qualified, not absolute. *See* 26 V.S.A. § 1317(e) (bad faith report to Board not shielded from liability); 26 V.S.A. § 1442(a) (bad faith conduct related to peer review committee not shielded from liability); 42 U.S.C. § 11112(a) (no liability shield for professional review action undertaken in bad faith). At this stage, Dr. Chase's allegations potentially fall

within the ambit of the exceptions to the general cloak of immunity that exists for such proceedings.[1]

V.    Conclusion

Based on the foregoing, Defendant's partial motion to dismiss is denied. Counsel are to confer and submit a proposed Discovery/ADR schedule within 21 days.

Electronically signed on Thursday, January 4, 2024, per V.R.E.F. 9(d).

_____
Timothy B. Tomasi
Superior Court Judge

---

[1] To the extent Gifford additionally argues that the federal statute is not implicated because its peer review process did not have an impact on Dr. Chase's position or status, the Court is not persuaded. The statute focuses on actions that "may" have such an impact, and the allegations here are sufficiently broad to support such an inference. 42 U.S.C. § 11151(9) (defining "professional review action," in part, as an action "which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician"); *see* Vt. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."). In any event, if the statute did not apply to the process in this instance, the qualified privilege also would not apply.

10