*Wood v. City of Barre*, No. 369-6-14 Wncv (Tomasi, J., Feb. 9, 2016).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

| SUPERIOR COURT | CIVIL DIVISION |
|---|---|
| Washington Unit | Docket No. 369-6-14 Wncv |

Russell Wood,
    Plaintiff

    v.

City of Barre,
    Defendant

## Opinion and Order
## the City's Motion for Summary Judgment

Plaintiff Russell Wood was a firefighter employed by the City of Barre. He was terminated in July 2012, a few months after experiencing debilitating symptoms of post-traumatic stress disorder (PTSD) that prevented him from working. He asserts that his firing and a prior refusal to promote him violated Vermont's Fair Employment Practices Act (FEPA), 21 V.S.A. § 495(a)(8), because those acts amounted to unlawful retaliation against him for supporting a female firefighter's claim of sexual discrimination. He also contends that the City violated FEPA by terminating his employment rather than providing a reasonable accommodation for his PTSD.[1] 21 V.S.A. § 495(a)(1). Lastly, he argues that the City's conduct amounts to intentional infliction of emotional distress (IIED). The City seeks summary judgment on all three claims.

1.    *Summary Judgment Standard*

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] Mr. Wood voluntarily withdrew a third wrongful termination claim based on an alleged violation of public policy.

matter of law." Vt. R. Civ. P. 56(a). "In determining whether a genuine issue of fact exists, the nonmoving party receives the benefit of all reasonable doubts and inferences." *Samplid Enterprises, Inc. v. First Vermont Bank*, 165 Vt. 22, 25 (1996). "Where . . . the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by indicating an absence of evidence in the record to support the nonmoving party's case. The nonmoving party then has the burden of persuading the court there is a triable issue." *Mello v. Cohen*, 168 Vt. 639, 639–40 (1998).

2.    *Factual Background*

The summary judgment record is voluminous, and the Court will not delve into the nuances here.[2] For purposes of this decision, the following overview, drawing inferences in Mr. Wood's favor, provides the relevant material facts. Mr. Wood became employed by the City as a firefighter in 2003. At that time, he already had extensive firefighting experience, and he may have been suffering the early effects of what, many years later, would be diagnosed as PTSD. Within his first few years with the City, the Barre City fire department, including Mr. Wood, experienced an unusual number of emotionally traumatic situations (such as drownings and deaths of multiple children in fires). Mr. Wood also volunteered to provide assistance in the aftermath of Hurricane Katrina (2005), which further exposed him to emotionally traumatic situations.

---

[2] While the basic narrative of the progression of Mr. Wood's PTSD and eventual termination of employment appears to be largely undisputed, the more detailed facts and inferences drawn therefrom that form the bases of his legal claims are substantially disputed.

2

In 2010, Mr. Wood was diagnosed with PTSD. He purportedly told Assistant Chief Aldsworth and Chief Bombardier of the diagnosis (though Mr. Wood cannot confirm that he actually used the expression PTSD) and that he was in counseling. He did not ask for any accommodation for the PTSD and continued to perform his job adequately.

In retrospect, he believes that he had PTSD when he first became employed with the City, and "triggers" such as the above events and others contributed to the worsening of his condition. He also takes the position that the City did not do enough to "reach out" proactively and provide assistance to him and others in the department with PTSD or similar conditions.

There is no evidence, however, that Mr. Wood ever asked the department for any type of accommodation. Indeed, the only evidence in the record shows that, whatever his personal challenges with PTSD were, they did not cause him to be ineffective at work prior to April 2012. Mr. Wood maintained his employment and a regular work schedule up until 2012. In 2008 or 2009, Chief Bombardier promoted him to Lieutenant. In 2011, Mr. Wood was confident enough in his performance to apply for a position as Captain.

In 2010, a female firefighter in the department raised allegations of sexual harassment, the details of which are not in the record. It became widely known that Mr. Wood supported the female firefighter and this caused tension between him and Chief Bombardier. There is no indication in the record of any such tension beforehand or that Chief Bombardier had ever found Mr. Wood's performance unsatisfactory in any regard.

3

In 2011, Mr. Wood, among others, applied for a promotion to Captain. At least part of the evaluation process took place before an independent committee, which scored each candidate on an oral examination. Mr. Wood's score in the oral examination was not the highest among the candidates. The record is unclear as to how the oral examination fit together with other components of the evaluation process and how Mr. Wood performed on the other components. In the end, Chief Bombardier recommended a different candidate for the position, and City Manager Mackenzie accepted that recommendation. Prior to that decision, Chief Bombardier had said on more than one occasion words to the effect that there was no way that Mr. Wood would get the job. Although the context of any such statements is unclear (assuming they were made at all), one may infer that palpable tension had persisted between Mr. Wood and Chief Bombardier.

In April 2012, Mr. Wood overheard a radio communication by the Roxbury Fire Department involving a fatality. This triggered a debilitating "panic attack." Mr. Wood immediately recognized that he was unfit for work and that attempting to perform his job would place himself and others at risk of harm. He reported that to the City the day after the panic attack and began a period of leave. Confusion ensued as to what Mr. Wood needed to do to apply for and receive various benefits while on leave. The application processes generated a written opinion by Mr. Wood's health care providers to the effect that he could not work, as a firefighter or in any other capacity, due to his condition.

In July 2012, as his sick leave was running out, Mr. Wood and others on his behalf met with City Manager Mackenzie and Chief Bombardier. At this point, according to Mr. Wood, he knew he was about to be terminated and reluctantly

agreed to that over resignation, believing it would posture him more favorably for governmental benefits. According to Mr. Mackenzie, termination at that point was the only reasonable option because it had become clear that Mr. Wood was not going to be able to return to employment. At this meeting, Mr. Wood attempted to give Mr. Mackenzie a letter addressing his circumstances and mentioning, to some extent, his disability and disability-related rights. His PTSD rendered him unable to verbalize all of his thoughts and concerns at the meeting. Mr. Mackenzie took the letter, but inexplicably did not read it.

For purposes of summary judgment, it is reasonable to infer that, from the time of his panic attack in April 2012, Mr. Wood had become completely disabled and unable to work but did not want his circumstances to result in the termination of his employment. Throughout this time, he was attempting, largely without success, to cobble together benefits that he could receive while remaining employed. Though he may not have expressly asked for an accommodation, his need for one—if any reasonable one were available at all—was obvious. Despite the obviousness of the circumstances, there is virtually no evidence that the City explored, on its own or with Mr. Wood, whether any reasonable accommodation might be available.

Mr. Wood has been unemployed ever since, although in February 2015 he started volunteering with a different fire department by providing certain safety trainings.

3.      *Standards and Burdens on Alleged FEPA Violations*

The Vermont Supreme Court has been clear that the standards and burdens under FEPA are the same as those under Title VII of the federal Civil Rights Act of 1964. *Lavalley v. E.B. and A.C. Whiting Co.*, 166 Vt. 205, 211 (1997). The *Price*

5

*Waterhouse v. Hopkins*, 490 U.S. 228, 241–44 (1989), framework applies in cases where a discriminatory motive clearly was at work; the three-step burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), applies where there is circumstantial evidence of discrimination only, *Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15, ¶ 18, 176 Vt. 356, 364.

In this case, there is no direct evidence of discrimination, so the *McDonnell Douglas* framework applies.  Under that approach, the plaintiff has the "light" burden of showing a *prima facie* case.  Doing so switches the burden of production onto the employer to come forward with evidence of a nondiscriminatory justification for the action taken.  If that is done, then the burden shifts back to the employee to prove that the proffered reason was merely a pretext and that discrimination was the real motivation for the employer's action.  *Id.* at ¶¶ 24–27, 176 Vt. at 366–67.  The ultimate burden of persuasion remains with the plaintiff at all times.  *Id.* ¶ 18, 176 Vt. at 319.[3]  *Id.* ¶ 24, 176 Vt. at 366.

4.    *Retaliation*

Mr. Wood claims that the City retaliated against him for supporting the female firefighter who was raising allegations of sexual harassment.  FEPA bars sexual discrimination, 21 V.S.A. § 495(a)(1), and its anti-retaliation provision protects anyone who "has opposed any act or practice that is prohibited under this

---

[3] The Court notes that the *McDonnell Douglas* framework is intended to help the Court determine whether a claim should reach the jury but generally is *not* used to instruct the jury on the claims that reach it.  *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 154 (2d Cir. 2010); *Lewis v. City of Chicago Police Dep't*, 590 F3d 427, 439 (7th Cir. 2009); *Armstrong v. Burdette Tomlin Memorial Hosp.*, 438 F.3d 240, 249–50 (3d Cir. 2006).

6

chapter," *id.* § 495(a)(8)(A). Here, Mr. Wood's defense of the female firefighter would amount to a protected activity.

To establish a retaliation claim, the Plaintiff must show that:

(1) he was engaged in protected activity, (2) his employer was aware of that activity, (3) he suffered adverse employment decisions, and (4) there was a causal connection between the protected activity and the adverse employment action.

*Gallipo v. City of Rutland*, 163 Vt. 83, 92 (1994).

At oral argument on this motion, the City contended that, even if Mr. Wood could meet the above showing in this case, as a *prima facie* matter, the record establishes that the adverse employment actions here were motivated only by nondiscriminatory factors and Mr. Wood cannot establish that those reasons were pretextual. As a result, the question for the Court on summary judgment focuses on the fourth *Gallipo* factor.

In the City's view, many other employees of the fire department also supported the female firefighter, without experiencing retaliation; Mr. Wood failed to win the promotion to Captain due to his poor results on the oral examination; Chief Bombardier had actually paid for Mr. Wood to take courses that would have allowed him to compete for the job; and the lack of promotion (and much more so his termination) occurred so long after the protected activity that no causal connection between those events and his protected activity can be reasonably inferred.

On this record, the Court concludes that there are disputes of material fact as to the reasons that motivated the City's decisions and whether those choices may have been fueled by a retaliatory motive. There is substantial evidence that Mr. Wood's support for the female firefighter caused palpable friction between Mr. Wood

7

and Chief Bombardier. While the adverse employment actions occurred at a later point, the length of time between the events, alone, is not long enough to sever a potential causal link. *See In re McCort*, 162 Vt. 481, 494 (1994) (timing is but one among numerous potential indicia of causation). More importantly, there is no evidence that there ever had been any friction between the two before the protected activity, and the record supports the inference that the friction continued thereafter and could have led or contributed to the adverse employment actions. *See Gallipo*, 163 Vt. at 93 ("But more significant [than timing], in our view, is the fact that plaintiff had had no 'detail' assignments in at least ten years, nor had he received any disciplinary memorandum in twenty-six years until after he had filed a complaint with the Attorney General.").

While the City has strong evidence that Chief Bombardier actually supported Mr. Wood and that he was not promoted simply as a legitimate exercise of hiring discretion, that evidence is muddled by the above facts and otherwise is disputed by evidence that Chief Bombardier did not always recommend for promotion those with the highest score on the oral evaluation. Similarly, the City's failure to engage in meaningful discussions over accommodations for Mr. Wood's disability after April 2012 could permit the inference that it was looking for a reason to terminate him because of his prior support of the female firefighter. *See Gauthier v. Keurig Green Mountain, Inc.*, 2015 VT 108, ¶ 22 ("Bluntly stated, to show pretext, a [retaliation] plaintiff must establish that the defendant's proffered legitimate, nondiscriminatory reason is a lie."); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (affirming that plaintiff has burden to prove that "the desire to retaliate was the but-for cause of the challenged employment action).

Mr. Wood's retaliation claim has minimal, but sufficient support, to avoid summary judgment.

5.    *Disability Discrimination*

Mr. Wood claims that the City failed to accommodate his disability throughout the course of his employment leading up to April 2012 and in the period following his panic attack in April 2012, resulting in his termination.  To prove his case, Mr. Wood must establish the following:

> (1) plaintiff is a person with a disability under the meaning of [FEPA]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  The duty to accommodate "is ordinarily activated by a . . . sufficiently direct and specific" request for an accommodation.  *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009).  The duty to accommodate also arises when the need for accommodation is apparent to the employer even if the employee has not requested it or has had trouble articulating the need for accommodation.  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).  Sometimes, the employee and the employer must engage in an "informal, interactive process," 29 C.F.R. § 1630.2(o)(3), to determine an appropriate accommodation.  The failure to engage in that process, however, does not establish liability.  *State v. G.S. Blodgett Co.*, 163 Vt. 175, 184 (1995); *see also McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 100 (2d Cir. 2009).

To be clear, the duty to provide a reasonable accommodation applies to the limitations caused by the disability, not the disability *per se*.  *See Gammage v. West*

9

*Jasper Sch. Bd. of Educ.*, 179 F.3d 952, 955 (5th Cir. 1999) ("[T]he ADA does not require an employer to assume that an employee with a disability suffers from a limitation; as a result, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom."); *accord Adams v. Rice*, 531 F.3d 936, 944 (D.C. Cir. 2008); *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003) ("Put another way, there must be a causal connection between the major life activity that is limited and the accommodation sought.); *Felix v. N.Y. City Transport Authority*, 324 F.3d 102, 107 (2d Cir. 2003).

The purpose of providing an accommodation is to enable "the employee to perform an essential function of the job." 2 *Americans with Disabilities: Practice & Compliance Manual* § 7:131. The plaintiff has the burden of producing evidence showing that some reasonable accommodation was possible; the burden then switches to the defendant to prove that purported accommodation was not available because, *inter alia*, it would have impermissibly altered the plaintiff's job or it would have been unduly burdensome for the employer. *G.S. Blodgett Co.*, 163 Vt. at 181–82.

### a.   *The Period of Employment Prior to April 2012*

Mr. Wood's principal claim is that throughout his employment, from inception up to his panic attack in April 2012, the City was or should have been aware of his disability, yet it never offered him "support" or any accommodations. He asserts that the lack of support and accommodations caused his PTSD to worsen, eventually resulting in his inability to work. *See* Mr. Wood's Opposition to Summary Judgment 19 (filed Sept. 8, 2015) ("It is with this factual predicate that all legal analysis of Plaintiff's disability discrimination claim and possible

10

reasonable accommodations must begin."). Otherwise, he concedes that by the time of his termination in 2012, he was not able to work at all. *See id*. at 25 ("Plaintiff does not dispute that, on the date of July 20, 2012, he was likely incapable of performing the requirements of any employment.").

There is no factual basis or legal support for a disability discrimination claim of this nature. The record is devoid of evidence that, prior to the 2012 panic attack, Mr. Wood's condition caused him to need an accommodation to be able to perform any essential function of his job. There also is no evidence that he ever sought any accommodation, that he had any inability to communicate such a request, or that the need for an accommodation ever would have been obvious to his employer. In the absence of such evidence, Mr. Wood cannot establish a discrimination claim. Indeed, Mr. Wood performed his job, received a promotion, and attempted to become a captain all during this period.

In effect, Mr. Wood is not claiming that he needed an accommodation as contemplated by FEPA, but that the City should have unilaterally intervened in the progression of his (for a certain period of time, undiagnosed) PTSD and, had it done so, the medical outcome would have been better for him. He cites no legal support for such an amorphous and wide-ranging claim under FEPA or the ADA, and the Court has found none. The assertion approximates more of a medical negligence case rather than an employment discrimination matter. But, FEPA protects against discrimination; it does not require employers to intervene, *sua sponte,* in employees' personal health issues in the manner advanced by Mr. Wood. Mr. Wood's only potential disability discrimination claim accrued when the limitation

11

caused by his disability—the inability to work at all—became obvious, between his panic attack in April 2012 and his termination the ensuing July.

        b.     *The Failure to Accommodate Following the Panic Attack*

It is undisputed that on the day of his termination, Mr. Wood was unable to work at all, as a firefighter or otherwise. The evidence admits of the following inferences. Between Mr. Wood's panic attack and his termination, Mr. Wood wanted to remain employed by the City, was unable to work due to his PTSD, and needed a reasonable accommodation if any was available. While he did not vocalize a request for an accommodation, the circumstances made the need for one obvious, at least arguably so. The City concluded that Mr. Wood's disability rendered him unable to work indefinitely and did not explore the possibility of whether a reasonable accommodation may have been available.

The City's position is that, at the time of termination, no reasonable accommodation was available. In that regard, it relies heavily on a "Certification of Health Care Provider" report produced by Mr. Wood's health care providers for purposes of the Family and Medical Leave Act. The report clearly states that Mr. Wood is considered to have "episodes of incapacity" of "serious" duration and frequency. "It is not advisable for this patient/employee to return to former profession as a firefighter. Nor is it advisable for him to work intermittently in another area of employment. Thus, 'probable duration' is unable to be determined." Report of Linda Bisson, M.D., and Elizabeth Halloran, M.S., M.A., L.I.C.S.W. (dated July 5, 2012), Defendant's Motion for Summary Judgment, exh. M (filed July 8, 2015). Potent evidence such as this, considering the circumstances of the case, may

12

well persuade the finder of fact. It is insufficient, however, in light of the evidence described below, to warrant summary judgment.

Mr. Wood asserts that a reasonable accommodation was available: a period of unpaid leave during which he could focus intensely on his illness, unworried that his employment had been terminated, and then return to work, either as a firefighter, possibly with additional accommodations, or in another position with the City. Though stated in a somewhat conclusory manner, that is also the view of Mr. Wood's expert. Affidavit of Adam M. Grundt, Ph.D., Plaintiff's Opposition to Summary Judgment, exh. 17 (filed Sept. 8, 2015). The Court accepts for summary judgment purposes that the expert's opinion is credible. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 27, 175 Vt. 413, 426.

Courts have held that a reasonable accommodation can take the form of an unpaid leave of absence. *See, e.g., Criado v. IBM Corp.*, 145 F.3d 437, 443 (1st Cir. 1998) ("A leave of absence and leave extensions are reasonable accommodations in some circumstances."). While the length of that leave must be reasonable, there is no "unvarying requirement for definiteness" as to the expected length. *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 (1st Cir. 2000). "Each case must be scrutinized on its own facts." *Id.*

In this case, the operative collective bargaining agreement and City policies permitted City Manager Mackenzie to approve an initial six-month period of unpaid leave (and subsequent periods of leave). Mr. Mackenzie testified that granting such a leave, for at least six months, probably would not have harmed the City. But, he never considered it or discussed it with Mr. Wood—presumably because he believed that Mr. Wood was unlikely to ever be able to return to work as a firefighter.

13

Whether a leave was a reasonable accommodation and whether it would have been effective are matters of dispute that can only be resolved by a finder of fact.

No doubt, FEPA does not require "clairvoyance" from the employer, *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995), and it is not a "job insurance policy," *id.* Here, however, the evidence allows the inference that Mr. Wood was so distraught that he was unable to express his wishes orally, that the City did not even read his letter, and that the City had potential accommodations that it could have offered to him but did not. Those facts provide a sufficient basis to deny summary judgment. *See Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1287 (7th Cir. 1996) (employer's failure to explore and offer reasonable accommodation where need is apparent precludes entry of summary judgment).

Mr. Wood further asserts that, upon being able to return to work, the City could have further accommodated him by modifying his job responsibilities as a firefighter or by transferring him to a City job outside the fire department in which he would not be a "first responder." Given that summary judgment as to the 2012 termination has been denied, it is unnecessary to address these arguments in any detail. The Court simply notes that, on the present record, the availability and reasonableness of any such accommodations are wholly speculative. As for altering job responsibilities, there is no way to determine what alterations might have made any difference because there is no way to determine what his condition would have been if he had been able to return to work after a leave of absence. The event that precipitated his panic attack was merely hearing about a fatality on the radio, not actual involvement in firefighting activities. There is no way to evaluate the

14

reasonableness of an accommodation without knowing the specific limitation it is supposed to address.

Similarly, there is no way to determine that a transfer to a different job in City government might have been reasonable or available.[4]  Though there is some evidence of various City jobs that may have been open in the period following April 2012, there is no evidence as to which vacancies would have existed when Mr. Wood was ready to return to work, as to how the availability of any such vacancies might have affected his return date, as to whether he would have been qualified and capable for whichever jobs those may have been, and as to whether any collective bargaining agreements or other City policies would have permitted Mr. Wood to fill such vacancies.

6.      *Intentional Infliction of Emotional Distress*

Mr. Wood claims that the City's conduct in this case amounts to the tort of IIED.  IIED is described in the Restatement (Second) of Torts as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."

---

[4] It is not clear to the Court that, under FEPA, the transfer to a wholly different position with the employer is properly characterized as a reasonable accommodation for an employee who is unable, with accommodations, to perform the essential functions of the job he is in, especially where the employee never sought such a transfer.  There is some federal authority that requires a transfer to an alternative, vacant position as an accommodation when the employee has sought the move and the employer's policies permit it.  *See* 42 U.S.C.A. § 12111(9) (expressly defining "reasonable accommodation" to include "reassignment to a vacant position"). FEPA's definition of "reasonable accommodation" includes no such demand, 21 V.S.A. § 495d(12), and the Vermont Supreme Court has cited *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 289 n.19 (1987), for the proposition that an "employer [is] not required to find another job for [an] employee who is not qualified for job she was doing."  *G.S. Blodgett Co.*, 163 Vt. at 183.

Restatement (Second) of Torts § 46(1); *see Sheltra v. Smith*, 136 Vt. 472, 475–76 (1978) (adopting Section 46 in Vermont).[5]  The standard is high.  "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Denton v. Chittenden Bank*, 163 Vt. 62, 66 (1994) (quoting Restatement § 46 cmt. d).  "The court makes the initial determination of whether a jury could reasonably find that the alleged conduct satisfies all the elements of an IIED claim."  *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399.  A plaintiff cannot rely upon his perceptions of the defendant's motives to establish the tort— the test is objective.  *Id.* ¶¶ 17, 15; *Baldwin v. Upper Valley Servs, Inc.*, 162 Vt. 51, 57 (1994).

Mr. Wood asserts that the City was aware of his deteriorating condition for many years, easily could have stepped in to help him, but, instead, idly watched as his PTSD symptoms became so bad that he could not work at all.  The City then

---

[5] In numerous cases, courts condense the element of extreme and outrageous conduct to simply outrageous conduct.  The third Restatement clarifies that these are separate issues.

> The adjectives "extreme" and "outrageous" are used together in a fashion that might suggest that each merely emphasizes the other, rather than serving a distinct role.  However, some conduct that may be outrageous—for example, marital infidelity—is sufficiently common that it could not be characterized as extreme (although today it may also not be outrageous).  Similarly, some extreme conduct—climbing Mt. Everest, for example—is not outrageous.  Thus, this double limitation, "extreme and outrageous," requires both that the character of the conduct be outrageous and that the conduct be sufficiently unusual to be extreme.

Restatement (Third) of Torts: Phys. & Emot. Harm § 45 cmt. d.

brusquely fired him in derogation of his rights and without being willing to even consider supporting him or offering him an accommodation.

While the Court acknowledges that an actor's awareness of another's emotional sensitivity can be important in deciding whether certain conduct rises to the level of IIED, Restatement (Second) of Torts § 46 cmt. f, cited in *Denton*, 163 Vt. at 68, the conduct in this record does not come close to supporting an IIED claim. At most, the evidence could support findings that Chief Bombardier's annoyance at Mr. Wood's support for the female firefighter played some role in his decision making regarding the promotion to Captain and disinclined the City from proactively engaging him in an interactive process once he became unable to work. That is all. There is no evidence whatsoever that any agent of the City ever did anything regarding Mr. Wood that, objectively speaking, anyone knew or should have known would cause him extreme emotional distress. The apparent emotional distress he may have experienced arose out of his PTSD and exposure to "triggers." Those triggers were the same events that his colleagues also were exposed to in the ordinary course of their profession. Plaintiff has simply failed to identify any extreme or outrageous conduct on the part of the City. There is no basis for an IIED claim in this case.[6]

---

[6] Because the Court so rules, there is no need to address the City's municipal immunity argument.

<u>Conclusion</u>

For the foregoing reasons, the City's Motion for Summary Judgment is granted, in part, and denied, in part.

Electronically signed on February 09, 2016 at 10:03 AM pursuant to V.R.E.F. 7(d).

_____

Timothy B. Tomasi
Superior Court Judge